## Board of Registration in Medicine *vs.* Hallmark Health Corporation & others.[1]

Suffolk. April 7, 2009. - August 11, 2009.

Present: Marshall, C.J., Ireland, Spina, Cowin, Cordy, Botsford, & Gants, JJ.

*Board of Registration in Medicine. Hospital,* Peer review. *Privileged Communication. Evidence,* Privileged record.

Discussion of the complex regulatory scheme governing health care facility quality assessment and risk management. [504-506]

In a civil action by the Board of Registration in Medicine (board) seeking, in connection with the board's investigation of a physician prior to the commencement of an adjudicatory proceeding pursuant to G. L. c. 30A, access to materials located in the physician's credentialing files from certain hospitals, a Superior Court judge erred in granting summary judgment in favor of the hospitals, where, although the proceedings, reports, and records of a medical peer review committee are accessible to the board only after the commencement of an adjudicatory proceeding, G. L. c. 111, § 205 (*b*), grants the board access at an earlier stage of an investigation to materials that are less central to the peer review process [506-509]; therefore, this court remanded the matter for individualized consideration whether each of the documents in the physician's credentialing files was created by, for, or otherwise as a result of a medical peer review committee [509-510].

Civil action commenced in the Superior Court Department on March 12, 2007.

The case was heard by *Charles T. Spurlock,* J., on motions for summary judgment.

The Supreme Judicial Court granted an application for direct appellate review.

*Jennifer Grace Miller,* Assistant Attorney General, for the plaintiff.

*Joan Eldridge* for the defendants.

[1]Lawrence Memorial Hospital and Melrose-Wakefield Hospital (collectively Hallmark). Winchester Hospital was also a defendant in the original action, but because it has neither joined Hallmark's brief nor filed a brief of its own in this appeal, and because the dispute here centers on Hallmark, we focus on the facts and prior proceedings pertinent to the Hallmark entities. We use the term "hospitals" when referring to all defendants collectively.

*John J. Barter, Dean P. Nicastro, & James T. Hilliard*, for Professional Liability Foundation, Ltd., & another, amici curiae, submitted a brief.

*Timothy C. Miller*, of Texas, for Federation of State Medical Boards of the U.S., Inc., amicus curiae, submitted a brief.

MARSHALL, C.J. In response to a patient's complaint of physician misconduct during a physical examination, and pursuant to a statutory mandate, see G. L. c. 112, § 5,[2] the disciplinary unit of the Board of Registration in Medicine (board) is investigating a physician, referred to as Dr. John Doe.[3] In connection with the investigation, the board seeks materials located in Dr. Doe's credentialing files[4] from the defendant hospitals. Hallmark Health Corporation has declined to provide the requested materials because, it asserts, they are protected by the "medical peer review privilege." See G. L. c. 111, §§ 204 (*a*),[5] 205 (*b*).[6] After twice ordering that certain of the withheld materials be produced,

---

[2]General Laws c. 112, § 5, provides in pertinent part: "The board [Board of Registration in Medicine] shall investigate all complaints relating to the proper practice of medicine by any person holding a certificate of registration . . . and report the same to the proper prosecuting officers. There shall be established within the board of registration in medicine a disciplinary unit which will be responsible for investigating complaints and prosecuting disciplinary actions against licensees, pursuant to this section."

[3]A pseudonym. Dr. Doe's name was impounded in the Superior Court. See G. L. c. 112, § 5 (board "shall keep confidential any complaint").

[4]We describe the creation and content of the physician's credentialing files *infra.*

[5]General Laws c. 111, § 204 (*a*), provides in pertinent part: "Except as otherwise provided in this section, the proceedings, reports and records of a medical peer review committee shall be confidential and . . . shall not be subject to subpoena or discovery, or introduced into evidence, in any judicial or administrative proceeding, except proceedings held by the board[] of registration in medicine . . . ."

[6]General Laws c. 111, § 205 (*b*), provides in pertinent part: "Information and records which are necessary to comply with risk management and quality assurance programs established by the board of registration in medicine and which are necessary to the work product of medical peer review committees, including incident reports required to be furnished to the board of registration in medicine or any information collected or compiled by a physician credentialing verification service operated by a society or organization of medical professionals for the purpose of providing credentialing information to health care entities shall be deemed to be proceedings, reports or records of a medical peer review committee for purposes of [G. L. c. 111, § 204,] and may be so designated by the patient care assessment coordinator; *provided, however,*

a judge in the Superior Court changed course, agreed that the materials were protected by the medical peer review privilege,[7] and granted summary judgment in favor of the hospitals. The board appealed. On direct appellate review, we are asked to determine whether the board can access information contained in a physician's credentialing files prior to commencing an adjudicatory proceeding against that physician. Because G. L. c. 111, § 205 (*b*), expressly provides for such access, we vacate the judge's decision and remand for further proceedings consistent with our opinion.[8]

1. *Factual background.* We summarize the relevant facts from the judge's memorandum of decision and from undisputed facts in the record. Following a patient complaint, the disciplinary unit of the board initiated an investigation of Dr. Doe. In the course of the investigation, the board "developed information" that suggested that Dr. Doe "fraudulently procured renewal of his medical license by failing to report criminal charges on his license renewal applications," and which "requir[ed an] investigation of whether Dr. Doe has practiced medicine while the ability to practice medicine is impaired by alcohol or drugs." See 243 Code Mass. Regs. § 1.03(5)(a)(1) & (4) (1994). Pursuant to statutory authorization to compel document production "at any stage of an investigation," G. L. c. 112, § 5,[9] the board issued subpoenas to

that such information and records so designated by the patient care assessment coordinator may be inspected, maintained and utilized by the board of registration in medicine, *including but not limited to* its data repository and disciplinary unit" (emphases added).

[7]Although the judge's decision did not expressly specify which statutory medical peer review privilege applied to the materials in the credentialing files — G. L. c. 111, § 204 (*a*), or G. L. c. 111, § 205 (*b*) — the judge's analysis, discussed *infra*, suggests that he concluded that the materials were protected by § 205 (*b*).

[8]We acknowledge the amicus briefs of The Federation of State Medical Boards of the U.S., Inc., filed on behalf of the board, and of the Professional Liability Foundation, Ltd., and the Massachusetts Psychiatric Society, Inc., filed on behalf of the hospitals.

[9]General Laws c. 112, § 5, provides in pertinent part: "Upon request of the board's complaint counsel for the production of evidence at any stage of an investigation, pursuant to this chapter and regulations of the board promulgated thereunder, witnesses may be summoned and document production may be compelled by subpoenas or subpoenas duces tecum issued at the direction of the chairman of the board or his designee. Where appropriate, testimony may be taken within or without the commonwealth by deposition."

each of the hospitals on February 13, 2007, seeking documents related to Dr. Doe's credentialing, employment, and competence to practice medicine, as well as incident reports and complaints related to him.[10]

Hallmark Health Corporation is the parent of Hallmark System, Inc., a licensed hospital facility whose "campuses" include the former Melrose-Wakefield and Lawrence Memorial Hospitals (collectively, Hallmark). The information sought from Hallmark by the board is located in Dr. Doe's credentialing files, which Hallmark maintains pursuant to the requirement that all hospitals have a "qualified patient care assessment program" (QPCAP) to address, among other things, the credentialing of medical staff members. See G. L. c. 111, § 203 (*d*); 243 Code Mass. Regs. §§ 3.03(1)(c) & (2), 3.05(1) & (3) (1994). Under

---

[10]The subpoenas each sought the following material:

"All original documents, or copies thereof certified to be complete and accurate, requested below.

"1. All documents relating to the credentialing of John Doe, M.D.;

"2. All documents relating to John Doe, M.D.'s employment at [name of hospital], including but not limited to his personnel and/or employment file;

"3. All documents relating to any arrangement wherein the privileges, medical practice, or any portion thereof, of John Doe, M.D., would be monitored, proctored, supervised, chaperoned, assisted, reviewed, limited or observed in any other manner;

"4. All documents relating to any agreement between John Doe, M.D. and [name of hospital], to alter his privileges, medical practice or any portion thereof in any way including but not limited to voluntarily obtaining consultations on all or any portion of his cases or relinquishing certain privileges;

"5. All documents relating to any incident reports which make reference to John Doe, M.D. and the investigation and/or resolution thereof;

"6. All documents relating to any complaints (patient or other source) which relate to John Doe, M.D. and the investigation and/or resolution thereof;

"7. All documents relating to any remedial action or requirement including but not limited to a course of education and/or training imposed on John Doe, M.D. by [name of hospital] or any other entity; and

"8. All documents relating to John Doe, M.D.'s competence to practice medicine; and

"9. All documents relating to John Doe, M.D. and any violation of, or failure to adhere to, any law or regulation (including, but not limited to, the regulations of the Board) or bylaws of [name of hospital] or any other health care facility, medical staff, group practice, or professional medical association, whether or not the complaint or allegation specifically cites violation of a specific law or regulation."

Hallmark's medical staff credentialing policy, physicians seeking clinical privileges at Hallmark must apply for an initial appointment and must apply for reappointment at periodic intervals no greater than two years thereafter. See 243 Code Mass. Regs. § 3.05(1) (1994) ("health care facility must repeat these credentialing requirements at least every two years"). An applicant for an initial appointment must provide, among other things, information about prior education, training, experience, and licensure, as well as potentially negative information, including whether the applicant has ever been a criminal defendant, lost a professional license, had clinical privileges withdrawn, or been involved in any professional misconduct proceedings. For reappointment, an applicant must provide, among other things, information about compliance with Hallmark's rules, continuing qualifications, pending malpractice challenges or challenges to licensure, and any limitation, reduction, or loss of clinical privileges. In addition to information supplied by the physician, any incident reports or complaints involving the particular physician become part of the physician's credentialing file.[11]

The credentialing process at Hallmark involves the medical staff credentials committee, the medical council committee, and the board of trustees or its patient care assessment committee, each of which has been designated by Hallmark as a peer review committee.[12] Documents in a physician's credentialing folders are generated by the credentials office and reviewed by members of the credentials committee, who send their recommendation to the medical council, which in turn makes a recommendation to the board of trustees. The board of trustees or its designee makes the final decision on credentialing.

At issue in this matter are the contents of Dr. Doe's credentialing files at Hallmark for the years 2000, 2001, 2003, and 2005. All of the documents contained therein were, according to Hallmark's chief medical officer, Dr. Mike H. Summerer, obtained in conjunction with the credentialing process at Hallmark. According to Hallmark, the files are similar in content: each

[11]According to Hallmark's chief medical officer, Dr. Mike H. Summerer, Dr. Doe's credentialing files contain no incident reports or complaints.

[12]The board has not challenged Hallmark's designation of these committees as peer review committees.

contains, among other things, a letter to Dr. Doe from Hallmark regarding his application for reappointment to the Hallmark medical staff, an application for reappointment submitted by Dr. Doe, insurance information (including malpractice claims), licensing information, controlled substances certifications, and professional references and evaluations. The folders also contain Dr. Doe's curriculum vitae and a copy of his medical license, as well as materials generated by the board, including a document regarding physician verification data and a registration renewal application for the board.

2. *Prior proceedings.* After receiving the subpoena from the board, Hallmark declined to provide any of the information requested, asserting that, because the materials constituted either "records of a peer review committee" or "information and records necessary to comply with risk management and quality assurance function requirements," they were protected by G. L. c. 111, § 204 (*a*), or G. L. c. 111, § 205 (*b*), and therefore were "not subject to a Board subpoena" prior to the commencement of an adjudicatory proceeding by the board under G. L. c. 30A.[13,14] In response, the board filed a verified complaint for injunctive relief in the Superior Court on March 12, 2007, pursuant to G. L. c. 214, § 3, and G. L. c. 233, § 10, seeking to compel Hallmark to comply with the subpoenas because, according to the board, the subpoenas did not seek disclosure of materials protected by G. L. c. 111, § 204 (*a*), and because G. L. c. 111, § 205 (*b*), "specifically empowers" the board to "inspect" the materials withheld by Hallmark. Hallmark, in turn, provided a privilege log dated March 23, 2007, containing brief descriptions of responsive

[13]The board has not commenced an adjudicatory proceeding pursuant to G. L. c. 30A in this matter. In general, an investigation by the board becomes an adjudicatory proceeding under G. L. c. 30A if and when the board issues a "[s]tatement of [a]llegations" ordering a licensee to appear before the board and show cause why the licensee should not be disciplined. See 243 Code Mass. Regs. §§ 1.00 (1995).

[14]Winchester Hospital, in contrast, provided certain of the responsive documents and submitted a privilege log listing the documents that it withheld. In the same memorandum in which the judge ordered Hallmark to produce all documents not protected by G. L. c. 111, § 204 (*a*) (discussed *infra*), the judge concluded, after examining the Winchester privilege log, that the documents withheld by Winchester were covered by § 204 (*a*) and were therefore not accessible by the board. That portion of the judge's ruling is not before us.

documents from Dr. Doe's credentialing files. Following a hearing, a judge in the Superior Court issued a written memorandum on April 25, 2007, in which he declined to attempt a "piecemeal analysis from the vague descriptions in Hallmark's privilege log to determine which documents are subject to the peer review privilege" and ordered Hallmark to "produce all documents that are not privileged 'proceedings, records, and reports' " under § 204 (a), including, inter alia, all incident reports, credentialing items, and other "raw materials" not "created by, for, or otherwise as a result of the peer review committee." Hallmark did not produce any responsive documents but instead submitted affidavits from officers at Hallmark, together with information describing Hallmark's credentialing policy. Hallmark also agreed to produce Dr. Summerer for a deposition.

In August, 2007, having received no responsive documents from Hallmark, the board filed a motion to compel compliance with the judge's April 25 order. The board's motion was allowed on January 10, 2008, the judge ordering that Hallmark "shall provide the requested material within 10 days of this order . . . or appear in court to show why it should not be held in contempt." Rather than comply with the order, Hallmark moved for summary judgment on January 22, 2008.[15] After a hearing, the same judge allowed Hallmark's motion and denied the board's cross motion for summary judgment.[16] Final judgment entered pursuant to Mass. R. Civ. P. 54 (b), 365 Mass. 820 (1974), and the board appealed. We granted Hallmark's application for direct appellate review.

3. *Discussion.* Because we have previously described at some length the "complex" regulatory scheme governing health care

[15]Hallmark had previously moved, shortly before the judge's order to produce the nonprivileged documents, to dismiss the complaint for a lack of jurisdiction and for failure to state a claim. Because Hallmark filed an affidavit with that motion, a different judge in the Superior Court treated the motion as one for summary judgment in December, 2007, and ordered that it be served again.

[16]Prior to a decision in the Superior Court on the motions for summary judgment, the Appeals Court, in response to an emergency motion filed by Hallmark, stayed the January 9 order (ordering Hallmark to produce its documents) pending the outcome of the summary judgment motion. The decision of the judge in the Superior Court allowing Hallmark's motion for summary judgment did not make reference to the January 9 order. The Appeals Court subsequently dismissed as moot a petition for a further stay of appellate proceedings.

facility quality assessment and risk management, *Vranos* v. *Franklin Med. Ctr.*, 448 Mass. 425, 433 (2007), citing *Carr* v. *Howard*, 426 Mass. 514, 517-526 (1998), and *Beth Israel Hosp. Ass'n* v. *Board of Registration in Med.*, 401 Mass. 172, 177-182 (1987) (*Beth Israel*), we begin by briefly describing those contours of the scheme particularly pertinent to this appeal.

"Strong public policy mandates the highest quality of care in our health care facilities. That public policy finds voice in, among others, a strict regulatory scheme covering virtually all aspects of hospital operations." *Vranos* v. *Franklin Med. Ctr.*, *supra.* The board has the "primary responsibility" within that scheme for regulating the practice of medicine "in order to promote the public health, welfare, and safety." *Levy* v. *Board of Registration & Discipline in Med.*, 378 Mass. 519, 524 (1979), quoting St. 1975, c. 362, § 3. For this reason, the board has "broad authority to regulate the conduct of the medical profession." *Sugarman* v. *Board of Registration in Med.*, 422 Mass. 338, 342 (1996), citing *Kvitka* v. *Board of Registration in Med.*, 407 Mass. 140, cert. denied, 498 U.S. 823 (1990).

Among other things, the board protects the "strong public interest in promptly disciplining errant physicians." *Levy* v. *Board of Registration & Discipline in Med.*, *supra*, quoting *Arthurs* v. *Stern*, 560 F.2d 477, 480 (1st Cir. 1977), cert. denied, 434 U.S. 1034 (1978). General Laws c. 112, § 5, "mandates that the board 'investigate all complaints relating to the proper practice of medicine by any person holding a certificate of registration.' " *Wang* v. *Board of Registration in Med.*, 405 Mass. 15, 18 (1989), quoting G. L. c. 112, § 5. To further this purpose, G. L. c. 112, § 5, "is to be broadly construed." *Kvitka* v. *Board of Registration in Med.*, *supra* at 143, citing *Levy* v. *Board of Registration & Discipline in Med.*, *supra* at 525. See *Wang* v. *Board of Registration in Med.*, *supra* at 20 ("The board's purpose is protection of the public interest, and when the board exercises its statutory function of conducting disciplinary proceedings, it is pursuing that purpose").

Also "[i]ntegral" to the regulatory scheme is "an effective process for self-scrutiny, manifest most prominently in the medical peer review process." *Vranos* v. *Franklin Med. Ctr.*, *supra* at 433. To "promote candor" and "foster aggressive critiquing

of medical care by the provider's peers," *id.* at 434, quoting *Pardo* v. *General Hosp. Corp.*, 446 Mass. 1, 11 (2006), the law affords medical peer review proceedings the protection of confidentiality. *Vranos* v. *Franklin Med. Ctr.*, *supra* at 433. See G. L. c. 111, § 204 (*a*) (making confidential the "proceedings, reports and records of a medical peer review committee"). As we shall explain in more detail below, G. L. c. 111, § 205 (*b*), extends most — but not all — of the protections of § 204 (*a*) to qualified patient care assessment materials. It is the difference between these statutes that is determinative in this case.

In his decision allowing Hallmark's motion for summary judgment, the judge concluded that the documents in Dr. Doe's credentialing folders are covered by the medical peer review privilege and are therefore not available to the board at this stage of its investigation because the documents are "necessary to comply" with the board's risk management and quality assurance programs and are " 'necessary to the work product' of a peer review committee." See note 7, *supra*. The board argues that the judge erred in two respects in reaching this conclusion. First, the board maintains that the judge did not fully consider the distinction between G. L. c. 111, §§ 204 (*a*) and 205 (*b*), and, in particular, the difference in the extent to which each shields materials from the board, as distinguished from all other third parties. Second, the board asserts that the judge erred in ruling that the documents as a whole were inaccessible to the board without carefully considering whether each document was part of the "core" materials protected by § 204 (*a*), or, indeed, was privileged at all. We agree with the board on both points. Briefly, although §§ 204 (*a*) and 205 (*b*) operate similarly with respect to shielding information from the public and all third parties other than the board, they operate differently with respect to the board. As we shall explain, while § 204 (*a*) materials — proceedings, reports, and records of a medical peer review committee — are accessible to the board only after commencement of an adjudicatory proceeding under G. L. c. 30A, materials that are, in the words of the board, "less central" to the peer review process are protected only by § 205 (*b*) and are therefore accessible by the board at an earlier stage of an investigation.

Section 204 (*a*) provides that "the proceedings, reports and

records of a medical peer review committee" shall be "confidential" and "shall not be subject to subpoena or discovery" except in "proceedings held by [the board]." In *Beth Israel, supra* at 181-183, this court concluded that the statutory language "proceedings held by [the board]" referred to formal proceedings pursuant to G. L. c. 30A, and that the board therefore could not access "proceedings, reports and records" of a peer review committee prior to the initiation of a proceeding pursuant to G. L. c. 30A. The *Beth Israel* court also recognized, however, that because board access to "all other information generated by the QPCAP system in no way would violate the [peer review committee] privilege and is within the board's authority," a hospital "should make available to the board all incident reports, patient complaints, . . . *credentialing items* . . . and other items" (emphasis added). *Id.* at 183. Moreover, because § 204 (*a*) "promotes the uninhibited expression of professional opinions before a [peer review committee] and protects the [peer review committee's] work product," the court concluded, the statute "does not protect . . . the 'raw materials' relied on by a [peer review committee] if obtained from other sources." *Id.*, quoting § 204 (*b*), (*c*).

Shortly after the *Beth Israel* decision, the Legislature enacted § 205 (*b*), inserted by St. 1987, c. 579, "to protect QPCAP documents and records that might fall outside the scope of the § 204 (*a*) privilege." *Carr* v. *Howard*, 426 Mass. 514, 519 (1998) (discussing legislative history of § 205 [*b*]). Section 205 (*b*) thus extends the medical peer review privilege to materials that, while not necessarily "proceedings, reports and records," of a peer review committee, are nonetheless "necessary to comply with risk management and quality assurance programs established by the [board] and which are necessary to the work product of medical peer review committees." G. L. c. 111, § 205 (*b*). Such materials include "incident reports required to be furnished to the [board] or any information collected or compiled by a physician credentialing verification service operated by a society or organization of medical professionals for the purpose of providing credentialing information to health care entities." *Id.*

In one important respect, however, the protections of § 205 (*b*) are not coextensive with those afforded by § 204 (*a*). Section 205 (*b*) specifically provides that documents protected by that

statute "may be inspected, maintained and utilized by the [board], including but not limited to its data repository and disciplinary unit," and it does not require that such access be conditioned on the commencement of a formal adjudicatory proceeding. Thus, while §§ 204 (a) and 205 (b) both shield information from the general public and other third parties to the same extent, only information protected by § 204 (a) is shielded from the board prior to the commencement of a G. L. c. 30A proceeding. For this reason, Hallmark's argument that § 205 (b) affords the "full protections" of § 204 (a) is unavailing: the unambiguous language of the statute leaves no doubt that the Legislature intended that the board would have access to materials protected only by § 205 (b). Moreover, in providing for such access, the Legislature did not distinguish between the board's disciplinary unit and other units of the board, but rather made clear that it was referring to the board as a whole. See § 205 (b) (information may be inspected by board, "including but not limited to its data repository and disciplinary unit"). Simply put, "§ 205 (b) specifically grants the board access to such materials." Carr v. Howard, supra at 532 n.21. Where the language of the statute is unambiguous, we need not look to legislative history, but we observe that "[t]he legislative history of § 205 shows that it was enacted to permit use of these materials [referring to incident reports] by the board without sacrificing the confidentiality provided by § 204." Id.[17]

Our conclusion is consistent with the strong public policy protecting the confidentiality of peer review. While certain materials related to credentialing are available to the board, they remain shielded from the general public. See G. L. c. 111, § 205 (b) (materials accessed by board "shall remain confidential, and not subject to subpoena, discovery or introduction into evidence"). In other words, the board, but only the board, can access § 205 (b)

---

[17]Hallmark argues that our decision in Commonwealth v. Choate-Symmes Health Servs., Inc., 406 Mass. 27 (1989), controls and compels a conclusion that the board cannot access the materials in Dr. Doe's credentialing files. We disagree. The Choate-Symmes court concluded that pursuant to G. L. c. 111, § 204, a hospital was not required to produce "proceedings, reports and records of a medical peer review committee" in response to a subpoena from the board; it did not address whether § 205 (b) materials were protected to the same degree. Id. at 29.

materials, and the core "proceedings, records and reports" of a peer review committee remain cloaked by the stronger protections of § 204 (*a*) and thus inaccessible to both the public and, absent a G. L. c. 30A proceeding, the board. For these reasons, our conclusion advances the policy favoring the "highest quality of care in our health care facilities," *Vranos* v. *Franklin Med. Ctr.*, 448 Mass. 425, 433 (2007), because it ensures that the board can effectively comply with its statutory mandate to investigate physicians about whom complaints have been made while maintaining the sanctity of "proceedings, records and reports" of medical peer review committees and the views expressed therein. Moreover, because both medical peer review committees and the board serve the broad purpose of protecting and enhancing patient care, allowing the board alone to access certain materials in a physician's credentialing files to facilitate its investigations of physician misconduct enhances the statutory goals.

Having determined that § 205 (*b*) allows the board to access certain materials prior to an adjudicatory proceeding, we now address whether the § 204 (*a*) privilege applies to the materials sought by the board in this case. Hallmark argues that all of the materials in Dr. Doe's credentialing files are the core peer review "proceedings, reports and records" that are protected by § 204 (*a*) and that the entire contents of those files are therefore shielded from the board at this stage of its investigation. We disagree.

In determining whether a medical peer review privilege applies in a particular circumstance, we look to "the way in which a document was created and the purpose for which it was used, not . . . its content." *Carr* v. *Howard, supra* at 531. Therefore, the proper inquiry as to whether a document qualifies for protection under § 204 (*a*) is whether it was created "by, for, or otherwise as a result of a 'medical peer review committee.' " *Miller* v. *Milton Hosp. & Med. Ctr., Inc.*, 54 Mass. App. Ct. 495, 499 (2002). Under that formulation, while the work product of the various committees involved in credentialing at Hallmark — e.g., minutes from meetings, reports, or recommendations generated by or for the committees — are protected by § 204 (*a*), documents used by such committees are not necessarily similarly pro-

tected. See *Carr* v. *Howard*, *supra* at 522 n.7 (asserting privilege of § 204 without reliance on § 205 requires evidence that materials sought "were not merely 'presented to [a] committee in connection with its proceedings,' . . . but were, instead, *themselves*, 'proceedings, reports and records' of a peer review committee under § 204 [*a*]" [emphasis in original]); *Beth Israel*, *supra* at 183 ("Section 204 does not protect information generated by other components of the QPCAP system or the 'raw materials' relied on by a [peer review committee] if obtained from other sources").

We remand the case to the Superior Court for an individualized consideration whether each of the documents listed on Hallmark's privilege log is protected by either § 204 (*a*) or § 205 (*b*), bearing in mind that the burden is on Hallmark to establish that each document is privileged. See *Miller* v. *Milton Hosp. & Med. Ctr., Inc., supra*. The information provided in Hallmark's privilege log appears insufficient to determine which, if any, of the materials in Dr. Doe's credentialing files merit protection by § 204 (*a*), which qualify only for the lesser protections of § 205 (*b*), and which are not privileged at all. Where the files include, among other things, Dr. Doe's curriculum vitae and a copy of his medical license, as well as "information collected or compiled by a physician credentialing verification service," § 205 (*b*), it is clear enough that not all of those materials are "proceedings, reports and records" of a peer review committee, and that at least some of the materials should therefore be provided to the board.[18]

4. *Conclusion.* For the foregoing reasons, the decision of the judge is vacated, and this case is remanded for further proceedings consistent with this opinion.

*So ordered.*

---

[18]The judge need not necessarily order an in camera review of the contents of the credentialing files, see *Carr* v. *Howard*, 426 Mass. 514, 529 (1998) (in camera review is "last resort" in medical peer review context); the judge may order Hallmark to produce a log of the documents with more information about each document or make the determination based on the information already provided in the privilege log and available in the record.